**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ERIC SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:12-cv-00159-TWP-MJD |
| | ) |
| CORIZON, BRUCE LEMMON, | ) |
| A. BAKER, KIM DON, and | ) |
| MICHAEL MITCHEFF, RMD, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
**AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on the parties' cross motions for summary judgment. For the reasons explained in this Entry, the Defendants' Motions for Summary Judgment (Filing No. 117, Filing No. 126) are **GRANTED** and Plaintiff Eric Smith's ("Mr. Smith") Cross-Motion for Summary Judgment (Filing No. 138) is **DENIED.**

## I. BACKGROUND

This civil rights action was removed to this Court from the Marion Superior Court. Mr. Smith is an inmate currently confined at the Plainfield Correctional Facility. The Defendants are: Corizon; Indiana Department of Correction ("IDOC") Commissioner Bruce Lemmon ("Commissioner Lemmon"); Alia Baker, and Dr. Michael Mitcheff ("Dr. Mitcheff") (collectively, the "Defendants"). In his Amended Complaint (Filing No. 52), Mr. Smith alleges that the Defendants unlawfully denied him hernia surgery and replacement eyeglasses. He alleges that

Defendants were deliberately indifferent to his serious medical needs and Dr. Mitcheff committed medical malpractice. Mr. Smith seeks compensatory and punitive damages and injunctive relief.[1]

As noted, the Defendants seek resolution of Mr. Smith's claims through the entry of summary judgment and Mr. Smith has filed a cross-motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007).

## III. DISCUSSION

### A. Undisputed Facts

On the basis of the pleadings and the portions of the expanded record that comply with the requirements of Rule 56(c)(1), the following facts are undisputed for purposes of the cross-motions for summary judgment:

#### 1. Hernia issue

Mr. Smith first complained of a hernia on February 15, 2010 when he, then an inmate at the Westville Correctional Facility ("Westville"), submitted a Request for Healthcare about a lump in his lower stomach area. Mr. Smith was examined in nursing sick call on February 17, 2010. His hernia was soft and approximately 2 inches in diameter. The nurse noted that Mr. Smith did not grimace when she palpated the area and there was no redness, irritation, or inflammation. The

---

[1] Mr. Smith's claims for injunctive relief are **dismissed as moot** because since he filed his complaint, he has been provided hernia surgery and new eyeglasses.

hernia could be pushed back in and only popped out when Mr. Smith strained or exercised. The doctor ordered a hernia belt to contain the hernia. Mr. Smith received his hernia belt on March 10, 2010.

Mr. Smith was transferred from the Westville to the Wabash Valley Correctional Facility ("Wabash Valley") on April 23, 2010. On April 26, 2010, he submitted a Request for Healthcare asking for his hernia belt, which was taken by officers during a cell extraction. In response to this request, a nurse examined Mr. Smith on April 28, 2010. She noted that he had a hernia in his lower pubic area that was contained by a binder at the last facility, but the binder was confiscated before his transfer to Wabash Valley. Dr. Alfred Talens ("Dr. Talens") examined Mr. Smith on May 3, 2010 and noted that Mr. Smith's hernia was reducible when standing and when lying down. Dr. Talens ordered another hernia belt, which Mr. Smith received on May 12, 2010.

Mr. Smith submitted a Request for Healthcare on May 31, 2010, stating that his hernia was burning and painful and that he wanted surgery. In response to this request, he was seen in nursing sick call on June 2, 2010. Mr. Smith complained of a tugging and a pressure feeling at the hernia site and that it popped out when his body was upright. He also reported that he stopped using his hernia belt two days ago because of chafing. The nurse referred Mr. Smith to the doctor. Dr. Talens examined Mr. Smith on June 21, 2010, and again on August 23, 2010. At these appointments, Mr. Smith did not complain about his hernia. Rather, Dr. Talens noted Mr. Smith's complaints concerning a rash and right ankle pain.

Mr. Smith submitted a Request for Healthcare on October 14, 2010, again asking for surgery to repair his hernia. He was examined in nursing sick call on October 15, 2010. Mr. Smith reported a golf-ball sized hernia and that he had already seen the doctor twice. On examination, the nurse could not locate the hernia and Mr. Smith said he had pushed it back in prior to the examination. Mr. Smith then said if he strained, the hernia would pop out and he attempted to

strain and exercise in front of the nurse, but the nurse advised him to stop. The nurse advised Mr. Smith to keep an eye on his hernia since he could push the hernia back in and he had already seen the doctor twice. She also advised Mr. Smith to let medical staff know if the hernia became bigger or caused excessive pain.

On May 24, 2011, Mr. Smith submitted a Request for Healthcare stating that his hernia popped out when he stood up but popped back in when he laid down. He also said his hernia was painful and the size of a ping pong ball. Mr. Smith was examined in nursing sick call on May 25, 2011. The nurse noted that Mr. Smith's hernia popped in and out and was the size of a baseball. She also noted that Mr. Smith had a hernia belt. The nurse referred Mr. Smith to the doctor.

On June 6, 2011, Dr. Jacques LeClerc ("Dr. LeClerc") examined Mr. Smith and noted that the hernia was tense and not reducible manually and had gradually increased in size over the past 2-3 years. Dr. LeClerc referred Mr. Smith to Wishard Hospital for a surgical evaluation and the appointment was scheduled for July 19, 2011. Medical records reflect that on July 19, 2011, Mr. Smith had a court date and could not make his Wishard Hospital appointment, so the appointment was rescheduled for September 27, 2011.

Mr. Smith submitted another Request for Healthcare on August 2, 2011, asking when he would get surgery for his hernia. In response, medical staff informed him that his appointment was rescheduled because of his court date. Mr. Smith submitted another Request for Healthcare on September 22, 2011, again asking when he would get surgery for his hernia. In response, medical staff informed him that he would be reassessed, but was not given a specific date. Offenders are not told about the date and time of their medical appointments outside of the prison pursuant to the IDOC's security policies.

Mr. Smith went to Wishard Hospital on September 27, 2011, for a surgical evaluation of his hernia. The Wishard Hospital surgeon noted that the hernia was reducible with palpation, and

that Mr. Smith did not have pain in his testicles, did not have bloody stools, and was not constipated. The Wishard Hospital doctor also noted that Mr. Smith was eating and drinking well. The Wishard Hospital doctor recommended surgery, but also stated that the "procedure may not benefit patient." At the prison, Dr. LeClerc submitted a consultation request for the surgery and Dr. Mitcheff, the Regional Medical Director for Corizon, Inc., responded that he would examine the patient himself.

Dr. Mitcheff's role as Regional Medical Director for Corizon is to hire physicians and review recommendations from the prison physicians for non-formulary medications or for surgery and/or off-site testing, treatment or referrals. Like other major healthcare organizations, Dr. Mitcheff reviews the recommendations for medical necessity and to determine if they meet insurance criteria. Dr. Mitcheff avers that the cost of healthcare is a consideration, but is rarely a factor in determining what medical treatment an offender needs. Offenders receive medical treatment that is medically necessary for them, regardless of the cost. If Dr. Mitcheff disagrees with a prison physician about a medication, surgery, or off-site treatment, the treating physician at the prison can ultimately do what he or she feels is medically necessary for the patient, regardless of Dr. Mitcheff's input.

Mr. Smith submitted a Request for Healthcare on October 6, 2011, stating that he thought he was having complications from his hernia. In response, medical staff told him he was scheduled to see the doctor.

On November 22, 2011, Dr. Mitcheff reviewed Mr. Smith's history regarding his hernia and concluded that surgery could be safely deferred because the hernia was reducible and therefore was at low risk for strangulation. While the Wishard Hospital doctor recommended surgery, he also noted that Mr. Smith's hernia was reducible and not causing him any problems with bowel function, did not extend into his scrotum, and was not causing him any problems eating or drinking.

It was Dr. Mitcheff's opinion that surgical repair of Mr. Smith's hernia was not medically necessary at that time and was elective and his condition could be appropriately managed with conservative care. The cost of hernia surgery is minimal and was not a factor for Dr. Mitcheff to consider in determining whether Mr. Smith needed to have his hernia surgically repaired.

Dr. Lolit Joseph ("Dr. Joseph") examined Mr. Smith in the Chronic Care Clinic on December 5, 2011. Dr. Joseph noted that Mr. Smith reported pain and swelling in the left inguinal area. Dr. Joseph noted small swelling in the left inguinal area, but she was not able to do a proper examination because Mr. Smith was handcuffed. Dr. Joseph noted that she would check Mr. Smith's chart and find out why surgery was not done. On December 22, 2011, Dr. Joseph noted that Mr. Smith's hernia was reducible while lying down, so surgery was deferred.

Mr. Smith submitted a Request for Healthcare on January 10, 2012, asking for a medical pass to wear his hernia belt. He reports that correctional staff took his hernia belt from him on December 22, 2011, in retaliation against him and they told him he needed a pass to have his hernia belt. Mr. Smith was in extreme pain without it. Medical staff responded to the request the following day and informed Mr. Smith that Dr. Joseph thought that there was no need for a hernia belt and he could discuss the issue at Mr. Smith's next chronic care visit.

Mr. Smith was examined by Dr. LeClerc on February 20, 2012, for his hernia. Dr. LeClerc prescribed Zoloft. Dr. LeClerc examined Mr. Smith again on March 13, 2012, and noted that Mr. Smith had a non-reducible left inguinal hernia. Dr. LeClerc referred Mr. Smith for a surgical consultation. On April 11, 2012, Mr. Smith went to Terre Haute Regional Hospital for a general surgery consultation. The doctor noted that Mr. Smith had a left groin bulge for the last two years, with no bowel problems. The left inguinal hernia was reducible and tender.

On April 12, 2012, Dr. LeClerc submitted a consultation request for a laparotomy-assisted left inguinal hernia repair. Dr. Mitcheff agreed that the surgery was appropriate because Mr.

Smith's hernia had been present for over two years and it was tender and at times non-reducible, so it was at an increased risk for incarceration and/or strangulation. Before surgery could be scheduled, however, Mr. Smith was transferred to the Westville on May 1, 2012.

On May 12, 2012, Mr. Smith submitted a Request for Healthcare regarding his hernia. He reports that three different doctors recommended surgery and that his hernia caused extreme pain and interfered with normal daily activities. He could not exercise, lift heavy objects, or stand for long periods of time.

Mr. Smith was seen in nursing sick call on May 24, 2012. He admitted that his hernia was reducible, but that it caused daily pain. Mr. Smith was given a supply of Ibuprofen for five days and referred to the provider.

Dr. Kevin Krembs ("Dr. Krembs") examined Mr. Smith on July 3, 2012 and noted that Mr. Smith's hernia was difficult to reduce and that he had been approved for surgery at the last prison, but was transferred before it could be scheduled. Dr. Mitcheff agreed with this recommendation since it had already been discussed and decided at the last prison. Dr. Krembs submitted another surgery consultation request on July 18, 2012. Dr. Krembs ordered a pre-operative EKG on July 23, 2012. Mr. Smith went to St. Anthony Hospital on July 31, 2012, and was examined by general surgeon, Dr. Danny Sardon. Dr. Sardon recommended surgery.

Mr. Smith had his left inguinal hernia repaired at St. Anthony Hospital on August 9, 2012. Dr. Krembs saw Mr. Smith when he returned from the hospital and ordered Ultram 50 mg. twice a day for seven days, dressing changes to surgical site as needed, and a urinal at night.

Mr. Smith submitted a Request for Healthcare on August 12, 2012, stating that he had not been able to have a bowel movement since his hernia surgery. He was seen in nursing sick call the next day and his vital signs were normal and his surgery site looked great. He was given Lactulose to aid with defecation. Mr. Smith was seen again in nursing sick call on August 13,

2012. His vital signs were normal and he had weak bowel sounds. His surgery site looked good with no infection. The nurse encouraged him to drink fluids.

The Development and Delivery of Health Care Services Policy No. 01-02-101 states, in part:

> II.     Policy Statement
>
> All confined offenders shall have access to health care services necessary to treat serious medical conditions. The general categories of services that shall be available are consultation, diagnosis, evaluation, treatment, and referral.
> ….
> Health care services shall take into account effectiveness and efficiency, and shall be planned so as to conserve Department resources when possible.
> ….
>
> V.     Scope of Health Care Services Program
> ….
>
> Elective surgical procedures will not generally be provided during confinement unless the condition is a serious medical condition and other treatment is not available, nonsurgical treatment has been provided and determined to be unsuccessful, or the elective procedure cannot wait until the offender is released from confinement.

## 2.     Eyeglasses Issue

On January 26, 2010, Mr. Smith submitted a Request for Healthcare asking for a new pair of glasses. He was seen by the optometrist on February 1, 2010. Mr. Smith's eyeglasses were ordered on February 24, 2010, and he received them on March 31, 2010. On that date, he signed a Statement of Responsibility acknowledging that if his glasses were "lost or damaged through carelessness or theft," he would have to pay for the replacement or repair.[2]

On or about November 18, 2011, Mr. Smith stepped on his glasses and broke them while being transferred from a courthouse to the penitentiary. Mr. Smith submitted a Request for

---

[2] Mr. Smith argues that he was "forced" to sign the statement of responsibility form and that he did not want to sign it. This does not change the fact that he did sign the form, and more importantly, he was aware of the fact that if his glasses were damaged through carelessness he would have to pay for a replacement.

Healthcare on November 20, 2011, stating that he broke his glasses when he accidentally stepped on them when they fell out of his shirt. Medical staff responded to this request the next day and informed Mr. Smith that he was only allowed one pair of State-paid glasses every two years and that he was not eligible again until February 24, 2012, and that he did not have enough money in his account to pay for a new pair.

Mr. Smith acknowledges that he could have had a friend send him money to pay for a new pair of glasses before the two-year period expired. However, he did not do that because he owed money to the law library for copies for all of his lawsuits and any money deposited to his account would have gone to satisfy that debt first. Mr. Smith's library debt for copies exceeded that of the cost of glasses, so if his friend sent in money, it would not have resulted in new glasses for Mr. Smith. Mr. Smith wanted his friend to order new glasses from an outside provider and then send them to the prison, but Mr. Smith was not permitted to do this.

The IDOC Vision Screening Policy states, in relevant part:

5. An offender who loses or destroys his/her glasses will be provided with a replacement at his/her own expense. In the event that he/she is indigent, a replacement will be provided and the individual's Inmate Trust Fund charged in accordance with governing rules and regulations. Glasses that wear out (scratches, broken frames, etc.) through no fault of the offender will be replaced at state expense. Glasses that wear out in less than 2 years will be presumed to have been mistreated.

This Healthcare Services Directive was written by the IDOC, not by Corizon.

Mr. Smith submitted a Request for Healthcare on November 28, 2011, stating that if he did not get a new pair of glasses, he would sue Corizon. He asked what the eyeglasses policy was and who was responsible for it. In response to this Request, Ms. Alia Baker ("Ms. Baker") informed Mr. Smith again that he was not eligible for a new pair of glasses until February 2012, and that he did not have sufficient funds in his account to purchase a new pair. She told him if he wanted to learn more about the IDOC policy regarding glasses, he could request a pass to visit the law library.

Mr. Smith wears glasses primarily for reading when he is doing legal work, reading books and newspapers, and also watching TV. He also wears them to look away at long distances because he is nearsighted. He does not wear glasses when he goes to recreation or to eat.

While Mr. Smith was incarcerated at the Wabash Valley, Ms. Baker was employed in the medical department as the medical records clerk. As the medical records clerk, it was Ms. Baker's job to maintain offenders' medical records. Ms. Baker was not a medical provider, nurse, or a medical professional of any kind. She did not assess, treat, diagnose, or interact with offenders. Ms. Baker had no personal involvement in any offenders' medical care and treatment. Ms. Baker did not respond to offenders' Requests for Healthcare when the Request involved medical issues or treatment. If, however, an offender had a question about his medical records, wanted copies of his medical records, or had a question about medical policies, Ms. Baker might respond to that type of request.

If he did not wear his glasses and tried to read without them for too long, Mr. Smith would get extremely painful headaches above his eyes. On August 10, 2011, he reported severe headaches. He was seen by a physician on August 29, 2011, at which time Mr. Smith reported having migraine-like headaches over the left eyebrow for two weeks. He denied any visual changes. Light and noise reportedly aggravated the headaches. Naprosyn was prescribed. When Mr. Smith requested a refill on September 22, 2011, he was given Excedrin Migraine. He requested a refill of Excedrin Migraine medication on December 2, 2011, reporting that the medication relieved the headaches.

Mr. Smith had an eye exam with the prison optometrist on April 6, 2012, and received a new pair of eyeglasses, at the State's expense, on April 27, 2012.

## B.    Analysis

At all times relevant to Mr. Smith's claims, he was a convicted offender. Accordingly, his

treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a medical claim that a prison official has violated the Eighth Amendment, a plaintiff must demonstrate two elements: (1) an objectively serious medical condition, and (2) deliberate indifference by the prison official to that condition. *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013).

As to the first element, "[a]n objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotation omitted).

"To show deliberate indifference, [Mr. Smith] must demonstrate that the defendant was actually aware of a serious medical need but then was deliberately indifferent to it." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). "A medical professional's deliberate indifference may be inferred when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King,* 680 F.3d at 1018-1019 (internal quotation omitted). The Eighth Amendment "can only be violated through deliberate action or inaction-mere negligence is not 'punishment.'" *Olson v. Morgan,* 750 F.3d 708, 713 (7th Cir.

2014). "Even gross negligence is insufficient to impose constitutional liability." *McGee*, 721 F.3d at 481. Deliberate indifference is "essentially a criminal recklessness standard, that is, ignoring a known risk." *Id.* (internal quotation omitted).

"An inmate is not entitled to demand specific care and is not entitled to the best care possible ...." *Arnett v. Webster,* 658 F.3d 742, 753 (7th Cir. 2011). Rather, an inmate "is entitled to reasonable measures to meet a substantial risk of serious harm." *Id.*

### 1. Hernia

#### a. Dr. Mitcheff

Mr. Smith alleges that defendant Dr. Mitcheff ignored his complaints of pain caused by his hernia and unnecessarily delayed his surgery. He further alleges that it is a policy of Corizon and Commissioner Lemmon to reduce costs as much as possible in providing medical care, causing medical providers to deviate from normal practices and standards of medical care.

Defendants contend that prior to the time that Mr. Smith's hernia became non-reducible and at risk for strangulation, it did not present an objectively serious medical condition, but they concede that after it became non-reducible, the hernia constituted a "serious medical condition." Therefore, the Court shall proceed to the second element of Mr. Smith's denial of surgery claim.

Mr. Smith first complained of a hernia on February 15, 2010. At that time, his hernia was soft and was about 2 inches in diameter. A hernia belt was provided to contain the hernia. On May 31, 2010, Mr. Smith complained that his hernia was causing pain and he wanted surgery. When Dr. Talens examined Mr. Smith on June 21 and August 23, 2010, Mr. Smith discussed pain in his ankle and did not mention his hernia. Mr. Smith complained of hernia pain again in October 2010. Thereafter, he was seen by nursing staff, who could not see the hernia because Mr. Smith had pushed it "back in" before the examination. The nurse told Mr. Smith to let medical staff know if the hernia became larger or caused excessive pain.

Mr. Smith again complained of hernia pain on May 24, 2011 and he was seen by nursing staff on May 25, 2011. Nursing staff noted that the hernia was popping in and out and was the size of a baseball. Dr. LeClerc examined Mr. Smith on June 6, 2011. At that time, the hernia was not reducible manually and had increased in size and Mr. Smith was referred for a surgical evaluation to Wishard Hospital on July 19, 2011. That appointment had to be rescheduled.[3] Mr. Smith was then seen at the hospital on September 27, 2011. The surgeon noted that the hernia was reducible with palpation, and that Mr. Smith did not have pain in his testicles, did not have bloody stools, was not constipated, and was eating and drinking well. The hospital physician recommended surgery but stated that the "procedure may not benefit patient." Dr. LeClerc then submitted a consultation request for surgery.

On November 22, 2011, Dr. Mitcheff reviewed Mr. Smith's history and determined that surgery could be safely deferred. It was Dr. Mitcheff's opinion at that time that surgical repair of Mr. Smith's hernia was not medically necessary because it was not incarcerated or strangulating, it did not impair bowel function or cause other serious problems, and it was reducible.

Dr. Joseph examined Mr. Smith on December 5, 2011, noting that Mr. Smith reported pain and swelling in the left inguinal area. On December 22, 2011, Dr. Joseph reviewed the records and noted that Mr. Smith's hernia was reducible while lying down so surgery had been deferred.

Dr. LeClerc examined Mr. Smith on February 20, 2012, and prescribed Zoloft. On March 13, 2012, Dr. LeClerc examined Mr. Smith and noted that the hernia was non-reducible. Dr. LeClerc referred Mr. Smith to Terre Haute Regional Hospital for a surgery consultation. The hospital physician noted that the hernia was reducible and tender. On April 12, 2012, Dr. LeClerc

---

[3] The medical record reflects that the appointment had to be rescheduled because Mr. Smith was out to court. (Filing No. 120-5, at ECF p. 18.) Mr. Smith alleges that he was not out to court, but he has presented no supporting evidence to refute the medical report.

submitted a consultation request for a laparotomy-assisted left inguinal hernia repair. Dr. Mitcheff agreed that surgery was appropriate at that time because the hernia had been present for two years and it was tender and at times non-reducible, so it was at an increased risk for incarceration or strangulation. Unfortunately, Mr. Smith was transferred to a different prison before surgery could be scheduled.

At the new prison, Westville Correctional Facility, Mr. Smith submitted a healthcare request reporting that his hernia caused extreme pain and physicians had previously recommended surgery. When Mr. Smith was seen by nursing staff on May 24, 2012, he admitted that his hernia was reducible, but reported that his hernia caused daily pain. He was given Ibuprofen and referred to a physician.

Dr. Krembs examined Mr. Smith on July 3, 2012, and at that time the hernia was difficult to reduce. He submitted a surgery consultation request and ordered a pre-operative EKG. Dr. Mitcheff agreed that the consultation request was appropriate because Mr. Smith had been sent for surgery when he was at Wabash Valley. Mr. Smith was seen at St. Anthony Hospital on July 31, 2012, and the physician there recommended surgery. Mr. Smith had his left inguinal hernia repaired on August 9, 2012.

"[T]he Eighth Amendment does not require that prisoners receive unqualified access to health care." *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006) (internal quotation omitted). Prisoners "are entitled to only adequate medical care." *Id.* (internal quotation omitted). Although Mr. Smith was not provided surgery as quickly as he wanted, the medical providers monitored his condition and evaluated his risks for serious problems which could be caused by the hernia. As long as the hernia remained reducible, the risk of strangulation or incarceration was low. Over time, after the hernia had increased in size and was more difficult to reduce, Dr. Mitcheff determined that surgery was medically necessary, and no longer elective. The medical

providers considered Mr. Smith's subjective complaints, examined the area of the hernia, and applied their medical experience and knowledge in determining the proper course of treatment.[4]

The record demonstrates that the medical care provided to Mr. Smith for his hernia was reasonable and appropriate, and no reasonable jury could infer that Dr. Mitcheff acted with deliberate indifference in treating Mr. Smith. Even if Mr. Smith had shown negligence on the part of Dr. Mitcheff, which he has not done, that would not be sufficient to survive summary judgment as to his claim of deliberate indifference. *See Lee v. Young,* 533 F.3d 505, 509 (7th Cir. 2008) ("negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense"). In evaluating a deliberate indifference claim, a "physician's treatment decisions are entitled to deference unless no minimally competent professional would have done the same." *Luckett v. Heidorn,* No. 13-3342, 2014 WL 2766202 (7th Cir. June 19, 2014). In sum, there is no evidence that Dr. Mitcheff's actions fell below the applicable standards of care. Consequently, Dr. Mitcheff is entitled to summary judgment on the deliberate indifference claim relating to the Mr. Smith's hernia.

### b. Corizon and Commissioner Lemmon

Corizon can only be liable if Mr. Smith's constitutional rights were violated as a result of an express policy or custom of Corizon, not on the theory of vicarious liability of responsibility for misdeeds of employees. *Woodward v. Correctional Medical Services of Ill., Inc.,* 368 F.3d 917, 927 (7th Cir. 2004) ("a policy or practice must be the direct cause or moving force behind the constitutional violation.") (internal quotation omitted). There is no evidence that Mr. Smith's treatment was dictated by any Corizon policy.

---

[4] Mr. Smith argues that it is not fair that he cannot afford to hire a medical expert. The right to access courts, however, does not obligate the Court to subsidize an indigent party's litigation by paying for expert witnesses. *See McNeil v. Lowery,* 831 F.2d 1368, 1373 (7th Cir. 1987).

It is true that an IDOC policy, the IDOC Health Care Services Policy, directs that medical services "shall take into account effectiveness and efficiency, and shall be planned so as to conserve Department resources when possible." This type of policy is not inherently unlawful. Contrary to Mr. Smith's contentions, it is not unconstitutional to consider the costs of various treatments. "The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." *Johnson,* 433 F.3d at, 1013. In addition, the record demonstrates that cost was not, in fact, a factor when the need for surgery was evaluated. Defendants Corizon and Commissioner Lemmon are thus entitled to summary judgment on Mr. Smith's deliberate indifference claims relating to the treatment of his hernia.

### 2.     Eyeglasses

Mr. Smith asserts that if he reads too long without eyeglasses he gets a severe headache. Defendants Corizon, Ms. Baker, and Dr. Mitcheff argue that Mr. Smith's need for glasses was not a serious medical need because his corrected vision "was not essential to his physical health." (Filing No. 118 at ECF p. 15).

Courts have found in certain circumstances that a lack of eyeglasses can result in an objectively serious medical condition if it significantly affects an inmate's ability to see. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir. 1996) (severe double vision and loss of depth perception caused by a head injury was a serious medical need where it led to the inmate running into things and falling down). If no physical harm is caused, courts have concluded that a temporary deprivation of glasses is not a serious medical need. *See Dobbey v. Randle*, No. 11-cv-0146, 2013 WL 4821027 (N.D. Ill. Sept. 10, 2013) (deprivation of glasses for several months while in segregation causing migraine headaches did not constitute objectively serious medical condition); *Lavin v. Hulick,* No. 09-cv-477-MJR, 2010 WL 2137250 (S.D. Ill. May 27, 2010) (inconvenience

of not being able to read as a result of denial of eyeglasses for three weeks resulting in no physical harm did not constitute serious medical need).

It is a close call, but the Court finds a reasonable jury could find that Mr. Smith's vision impairment was a serious medical need for purposes of the Eighth Amendment, therefore the Court will proceed to the second prong of the deliberate indifference test.

### a. Ms. Baker

Mr. Smith alleges that Ms. Baker failed to refer him to a physician for his headaches. Mr. Smith did not, however, ask to be seen by a medical provider. He stated in his November 28, 2011, Request for Healthcare that "This is in response to [his November 20, 2011, healthcare request]. You said I can't get a new pair of glasses due to policy. What policy is this, and who is responsible for this? It is a violation of the 8th Amendment to deny me glasses." He further stated that "without glasses, I got real bad headaches! I need a new pair or I will sue Corizon." (Filing No. 120-6 at ECF p. 11). Mr. Smith's request was for glasses, not to be seen for headaches. In addition, the undisputed record reflects that Ms. Baker was not a medical provider, nor did she have the authority to refer inmates to medical providers. Her responsibility was to maintain inmates' medical records. Ms. Baker provided Mr. Smith with information concerning the IDOC eyeglasses policy in response to his request for information about the policy.

Mr. Smith persuasively argues that Ms. Baker's response to the November 28, 2011, request, which he had sent to the eye clinic, in effect constituted a denial of eyeglasses. The Vision Screening Policy states that if an inmate is indigent and he loses or breaks his eyeglasses, a new pair is supposed to be provided and his trust fund charged "in accordance with governing rules and

regulations." Ms. Baker did not inform Mr. Smith of that provision, but there is no evidence that this omission was anything other than a misunderstanding on her part[5] or negligence.

There is no evidence in the record to demonstrate that Ms. Baker intentionally gave Mr. Smith incorrect information regarding replacement glasses under the Vision Screening Policy or that she was deliberately indifferent to his serious medical needs. In particular, Mr. Smith must show that Defendants "engaged in more than mere negligence, and that their conduct approached intentional wrongdoing or criminal recklessness." *Holloway v. Delaware Cnty. Sheriff,* 700 F.3d 1063, 1073 (7th Cir.2012) (citing *Farmer,* 511 U.S. at 837). None of Ms. Baker's actions or inactions violated Mr. Smith's constitutional rights. Therefore, Ms. Baker is entitled to summary judgment.

### b. Corizon and Commissioner Lemmon

As noted above, Corizon can only be liable if Mr. Smith's constitutional rights were violated as a result of an express policy or custom of Corizon. Mr. Smith has presented no evidence of any Corizon policy or custom that dictated when he could receive new glasses. Importantly, the Vision Screening Policy was not a Corizon policy.

If the IDOC eyeglasses policy with respect to indigent inmates had been properly applied, it appears that Mr. Smith should have received glasses more quickly. Mr. Smith did receive new glasses free of charge five months after his request. In essence, his claim is that his request for new glasses was unnecessarily delayed. "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of

---

[5] Indeed, even Dr. Mitcheff's affidavit describes the IDOC policy as follows: "According to this Healthcare Services Directive, the State pays for offenders' eyeglasses every two years. If an offender breaks or loses his glasses before the two years, the offender must replace the glasses at his own expense." Dr. Mitcheff makes no mention of what happens if an inmate is indigent.

harm." *Williams v. Liefer,* 491 F.3d 710, 714-15 (7th Cir. 2007); *see also Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir. 1996) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.").

In his declaration, Mr. Smith says that if he did not wear his glasses *and* tried to read too long without them, he would get painful headaches. During the time he was without glasses, on December 2, 2011, he once requested a refill of Excedrin Migraine medication. There is no record of him otherwise reporting headaches during the period he was without glasses, from November 18, 2011, through April 27, 2012. Further, Mr. Smith suffered from migraines in August of 2011, before he broke his glasses. Mr. Smith reports that he did not have to wear his glasses when he went to recreation or to eat. He used them primarily for reading, an activity he could control. The record does not demonstrate that Mr. Smith faced a potential for serious harm if he did not receive eyeglasses sooner than he did. There is no medical evidence demonstrating that any delay in providing eyeglasses caused Mr. Smith harm.

Commissioner Lemmon further argues that he was not personally responsible for any denial of eyeglasses and there is no evidence of deliberate indifference on his part. The requests for new glasses were sent to medical staff, not to the Commissioner. There is no evidence of any awareness on the part of Commissioner Lemmon that Mr. Smith was denied eyeglasses. For liability to be imposed for a violation of this right, a defendant must have personal involvement in the wrongdoing. *Burks v. Raemisch,* 555 F.3d 592, 593-94 (7th Cir. 2009) ("Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise.") (internal citation omitted). "It is well established that there is no *respondeat superior* liability under § 1983." *Gayton v. McCoy,* 593 F.3d 610, 622 (7th Cir. 2010). Even if Mr. Smith sent letters to

Commissioner Lemmon complaining about needing new eyeglasses, that fact is not enough to establish liability. Defendants who allegedly know about a violation of the Constitution but fail to cure it do not thereby violate the Constitution themselves. *George v. Smith,* 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible."). Commissioner Lemmon was not involved in determining when eyeglasses should be provided to Mr. Smith.

For all of these reasons, Defendants Corizon, Ms. Baker, and Dr. Mitcheff are entitled to summary judgment on the eyeglasses claim.

### 3. State Law Claims

There is no evidence that Mr. Smith presented his complaint to a medical review panel and obtained an expert opinion as to whether Dr. Mitcheff acted or failed to act within the appropriate standards of care. Ind. Code §34-18-10-22(a). The Indiana Medical Malpractice Act "grants subject matter jurisdiction over medical malpractice actions first to the medical review panel, and then to the trial court." *B.R. ex rel. Todd v. State,* 1 N.E.3d 708, 713 (Ind. Ct. App. 2013). It appears that this Court lacks jurisdiction over Mr. Smith's medical malpractice claim because he did not first obtain an opinion from the medical review panel. *Id.* The parties, however, have not briefed this issue, so the Court shall also proceed to consider the merits of Mr. Smith's claim.

In general, to prevail in a medical malpractice action based on negligence, "the plaintiff must establish: 1) a duty on the part of the defendant in relation to the plaintiff; 2) failure on the part of the defendant to conform to the requisite standard of care required by the relationship; and 3) an injury to the plaintiff proximately caused by that failure." *Bunger v. Brooks,* 12 N.E.3d 275, 281 (Ind Ct. App. 2014). Mr. Smith argues that he does not have to provide expert testimony to prove his claim because his condition fell within the "common knowledge" exception to the need for an expert opinion. This contention is not sufficient or specific enough to prove his claim. Mr.

Smith also contends that the fact that two hospitals recommended surgery proves that surgery was the required standard of care. Dr. Mitcheff did, in fact, agree at certain stages of the hernia's progression that surgery should be provided. Mr. Smith's untimely transfer to another prison, not Dr. Mitcheff's action or inaction, was the cause of delay of his surgery in April of 2012. Even after that time, in May of 2012, Mr. Smith's hernia was found to be reducible. What Mr. Smith lacks is admissible evidence that supports a finding that Dr. Mitcheff's decisions concerning the course of treatment for Mr. Smith's hernia failed to conform to the applicable standards of care. Mr. Smith has not established the second prong of his malpractice claim. Therefore, Dr. Mitcheff is entitled to summary judgment as to the state law medical malpractice claim.

## IV. CONCLUSION

Mr. Smith has not presented evidence sufficient to create a genuine issue of fact with respect to any of his claims. For the reasons explained above, the Defendants' motions for summary judgment (Filing No. 117, Filing No. 126) are **GRANTED** and Mr. Smith's cross-motion for summary judgment (Filing No. 138) is **DENIED.** Judgment consistent with this Entry and with the stipulation filed on August 27, 2013, shall now issue.

**SO ORDERED.**

Date: 8/28/2014

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Eric D. Smith, #112675
Plainfield Correctional Facility
Inmate Mail/Parcels
727 Moon Road
Plainfield, Indiana  46168

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Rebecca A. Brelage
OFFICE OF THE INDIANA ATTORNEY GENERAL
Rebecca.brelage@atg.in.gov